IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

FILED
U.S. DISTRICT COURT
AUGUSTA DIV.

20 MAR 13 PM 3: 30

CLERK _____
SO. DIST. OF GA.

GJ&L, INC.,

    Plaintiff,

v.

CNH INDUSTRIAL AMERICA, LLC,

    Defendant.

\*
\*
\*
\*
\*
\*
\*
\*
\*

CV 117-179

## O R D E R

Before the Court are the Parties' motions for summary judgment. Plaintiff GJ&L, Inc. doing business as Border Equipment ("Border" or "Plaintiff") moves for summary judgment on all counterclaims filed by Defendant CNH Industrial America, LLC ("CNH" or "Defendant"). (Doc. No. 83.) Defendant moves for summary judgment on its counterclaims and as to four of Plaintiff's claims. (Doc. No. 87.) The Clerk has given each party notice of the opposing summary judgment motion and the summary judgment rules, of the right to file affidavits or other materials in opposition, and the consequences of default. Therefore, the notice requirements of Griffith v. Wainwright, 772 F.2d 822, 825 (11th Cir. 1985) (per curiam), have been satisfied. Oral argument was held on February 20, 2020 and the motions are fully briefed and ripe for decision. For the following reasons, Plaintiff's motion is denied and Defendant's motion is granted in part.

# I.   Background

This case arises out of the Parties' contractual relations. Defendant manufactures heavy equipment for agricultural and construction use. Plaintiff operates dealerships selling Defendant's equipment to consumers. Two dealership agreements govern the Parties' relationship: one from 2008 and one from 2010. The present motions center on three disputes regarding the dealership agreements, each of which will be further explained in the ensuing paragraphs: first, an allegedly impermissible transfer of shares from one of Plaintiff's shareholders to another (Pl.'s Mot. Summ. J., Doc. No. 83, at 12-14; Def.'s Mot. Summ. J., Doc. No. 87, at 13-14); second, Plaintiff's opening of a dealership location in Savannah, Georgia without first obtaining Defendant's permission pursuant to the dealership agreements (Pl.'s Mot. Summ. J. at 14-16; Def.'s Mot. Summ. J. at 6-7, 14-15); third, Defendant's "chargebacks" of reimbursements it paid to Plaintiff for warranty work (Pl.'s Mot. Summ. J. at 16-18; Def.'s Mot. Summ. J. at 5-6, 9-10). Both Parties seek damages and declaratory judgments for breach of the 2008 and 2010 dealership agreements. Plaintiff also seeks an award of punitive damages, and both Parties seek attorneys' fees. Both Parties demand a trial by jury.

A. Share Transfers

Plaintiff is a corporation owned by Robert Stephens and his son, Lee. In December of 2008, Robert Stephens owned 241 (96.4 percent) of Plaintiff's 250 issued shares while Lee Stephens owned nine shares. (See Doc. No. 5-4, at 24.) From 2010 through 2015, Robert Stephens made six share transfers to Lee for estate planning purposes resulting in Robert Stephens owning 73 percent of Plaintiff and Lee Stephens owning 27 percent of Plaintiff. (See Robert Stephens Dep., Doc. No. 84-5, at 54; Doc. No. 84-12, at 1.) Defendant was not notified of the transfers until after they had occurred. (See Brett Arrowood Dep., Doc. No. 84-3, at 49-50.)

Defendant argues that the dealership agreements limit such transfers. Section 12 in both agreements requires Plaintiff to present proposed changes in **control or ownership** of the dealership to Defendant, which must then "give good faith consideration" to the proposed change.[1] (See Dealership Agreements, Doc. Nos. 5-4, 5-5, at 6-7) (emphasis added). "Change in control or ownership" is defined as "any event which may affect the operation of [Plaintiff's] business, including but not limited to . . . any

---

[1] At oral argument and in the briefs, the Parties frequently reference a proposed new dealership agreement. The proposed dealership agreement gives Defendant sole discretion in approving proposed management changes. (See New Dealership Agreement, Doc. No. 113-3, at 4.) The proposed agreement also gives Defendant the right to "refuse to appoint as an authorized dealer any purchaser or prospective purchaser of any of the shares or assets of Dealer." (Id.)

**substantial** change in the shareholders, if the Dealer is a corporation." (Id.) (emphasis added). Section 12 also provides that unauthorized ownership changes result in immediate termination of the agreement. (Id.) Here there appears to be no change in the identity of the shareholders (Robert and Lee Stephens), thus any question of "change in the shareholders" must relate to a change of proportion of ownership interest in the corporation. The question is whether the 23.4 percent shift in ownership from Robert Stephens to Lee Stephens is a change that may affect the operation of the dealership, whether that was "substantial" and if so, whether Defendant waived any such breach.

B. Savannah Dealership

The 2008 dealership agreement provided that Plaintiff would operate two dealerships, one in Augusta, Georgia and one to be established in Savannah, Georgia. (See Doc. No. 5-4, at 3, 14.) Section 4 of the dealership agreement prohibits the moving or opening of new locations without Defendant's written consent. (See id. at 3.) In 2009, Defendant permitted Plaintiff to operate the dealership that was planned for the Savannah market[2] in nearby Pooler, Georgia at 109 Sharon Court. (See Jim Bansen Aff., Doc. No. 87-2, ¶ 14.)

---

[2] Most would consider Pooler, Georgia to be within the "Savannah market."

4

In January of 2017, Plaintiff proposed moving its Pooler dealership to a new facility in Savannah. (See id. ¶ 15.) Defendant would not approve the move unless Plaintiff signed a new dealership agreement, which Plaintiff refused to do. (See id. ¶¶ 17-18.) Plaintiff nonetheless began operating a sales facility in Savannah at 5905 Ogeechee Road. Defendant became aware of what Plaintiff was doing in November of 2017 and reminded Plaintiff via email that it must, according to the contract, obtain Defendant's consent to open a new location. (See id. ¶¶ 20-22; Jim Bansen Email, Doc. No. 93-10.) In that email, Defendant's Regional Director of Sales[3] Jim Bansen stated: "Should you elect to continue to operate the Case CE location out of the prior facility in Pooler, GA **that is acceptable to resolve the breach of Section 4 . . . ."** (Jim Bansen Email) (emphasis added). A short time later, Plaintiff moved its operation back to the Pooler facility in January of 2018. (See Brett Arrowood Dep. at 86, 89-90.) According to Bansen, the unauthorized operation "deprives [Defendant] of the ability to control the management and distribution of its products." (Bansen Aff. ¶ 24.)

Defendant claims Plaintiff breached the 2008 dealership agreement, and Plaintiff counters that Defendant waived any such

---

[3] When the email was sent, Jim Bansen's title was "Distribution Development Manager."

claim and cannot rightfully refuse to allow it to operate in the Ogeechee Road location.

## C. Warranty Chargebacks

The third dispute is over who should bear the cost of certain warranty work performed at the dealerships. The final paragraph of Section 11 of the dealership agreements tersely provides: "[Defendant] shall reimburse [Plaintiff] for all warranty service performed on Products in accordance with [Defendant's] warranty policies and Certified Service Program requirements in effect at the time warranty work is performed." (See Dealership Agreements at 6.) According to Defendant, the warranty policies referenced in Section 11 are set forth in what the Parties refer to as the Dealer Operating Guide, or "DOG." (See May 2019 Sriyani Fernando Aff., Doc. No. 87-3, ¶ 3.) The DOG permits Defendant to audit Plaintiff's warranty service and requires Plaintiff to maintain and submit documentation of warranty service it performs to Defendant. (See id. ¶¶ 6-13.) Section 4.3.2 of the DOG states that if Plaintiff does not comply with the DOG's requirements, Defendant can "chargeback" Plaintiff for the amount it reimbursed Plaintiff for warranty service. (See id. ¶ 13.)

In May of 2017 Defendant audited Plaintiff's warranty service and contends that it identified $124,694 worth of warranty services not in compliance with the DOG. (See id. ¶ 14; Bansen Aff. ¶¶ 35-36.) Plaintiff has not paid the total chargeback amount of

6

$124,694. (See Bansen Aff. ¶ 38; Pl.'s Mot. Summ. J. at 2-4, 7.) Plaintiff contends that the DOG does not apply to it, or, if it does, that it complied with the DOG, while Defendant seeks to recoup the unpaid amount.

## II. Legal Standard

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A "material" fact is one that could "affect the outcome of the suit under the governing [substantive] law," Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986), while a dispute is genuine "if the nonmoving party has produced evidence such that a reasonable factfinder could return a verdict in its favor." Waddell v. Valley Forge Dental Assocs., Inc., 276 F.3d 1275, 1279 (11th Cir. 2001). Any inferences drawn from the facts must be in the light most favorable to the nonmoving party, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986), and the Court is to "resolve all reasonable doubts about the facts in favor of the non-movant." United States v. Four Parcels of Real Prop., 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc) (citation, internal quotation marks, and internal punctuation omitted). The Court may not weigh the evidence or determine credibility. Anderson, 477 U.S. at 255.

The moving party has the initial burden of showing the Court the basis for its motion by reference to materials in the record. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The movant may carry its initial burden in different ways depending on who bears the burden of proof at trial. See Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993). When the movant bears the burden at trial, it must make an affirmative showing of an absence of a genuine issue of material fact. See id. The nonmovant must then respond with "evidence sufficient to call into question the inference created by the movant's evidence on the particular material fact" to avoid summary judgment. Id. at 1116.

When the nonmovant bears the burden of proof at trial the movant has two options as to how it can carry its initial burden. Id. at 1115-16. The movant may demonstrate an absence of evidence to support the nonmovant's case, or provide affirmative evidence demonstrating the nonmovant's inability to prove its case at trial. Id. The nonmovant must then respond according to the manner used by the movant. The nonmovant must respond with "evidence sufficient to withstand a directed verdict" when the movant provided affirmative evidence. Id. When the movant demonstrates an absence of evidence, the nonmovant may either identify evidence in the record sufficient to withstand a directed verdict, or the nonmovant may come forward with additional evidence sufficient to withstand a directed verdict. Id. at 1116-17.

### III. Discussion

The claims at issue center on each Party's alleged breach of the dealership agreements. Georgia law applies because of the agreements' choice of law provisions. See Carr v. Kupfer, 296 S.E.2d 560, 562 (Ga. 1982) ("Absent a contrary public policy, this court will normally enforce a contractual choice of law clause."); (see also Dealership Agreements ¶ 23 (stating that the dealership agreements are governed by the laws of the state in which the dealer's principal place of business is located, in this case Georgia).) Three elements must be met for a breach of contract claim in Georgia: 1) a breach, 2) that causes damages, 3) to the party complaining of the breach. See Norton v. Budget Rent A Car Sys., Inc., 705 S.E.2d 305, 306 (Ga. App. 501).

### A. Share Transfers

The dispute over the share transfers is one of contract interpretation, which is initially a matter for the Court. See O.C.G.A. § 13-2-1 ("The construction of a contract is a question of law for the court. Where any matter of fact is involved, the jury should find the fact.") The issue is whether a transfer of 23.4 percent of the shares in Plaintiff from one owner to another is an "event which may affect the operation of [Plaintiff's] business." The contract lists such events as including "any substantial change in the shareholders, if the Dealer is a

corporation." If the transfers did violate the provision, the question then is whether Defendant waived the breach through its conduct.

Plaintiff argues that only a substantial change in the shareholders constitutes a change in control or ownership under Section 12 of the dealership agreements. However, the contract states that a substantial change in shareholders is merely an example of an event which "may affect the operation of [Plaintiff's] business." The inclusion of this example is nonetheless illustrative of both the phrase that precedes it and the intentions of the parties with respect to Section 12. See O.C.G.A. § 13-2-3 ("The cardinal rule of [contract] construction is to ascertain the intention of the parties.").

Defendant urges that the language "any event which may affect the operation of Dealer's business" controls and that even a 23.4 percent transfer from one existing shareholder to another "may affect" the dealership's operation. But the inclusion of the "substantial change in shareholders" language undercuts the conclusion that the parties intended such a strict interpretation. Additionally, Defendant's interpretation would broaden the reach of Section 12 far beyond the Section's intended scope: the language "any event which may affect" is unqualified and, if read literally, could be applied to any event regardless of its relation to a

10

change in control or ownership. The included example refines that interpretation into narrower application.

That application must require that an event at least be related to a change in control or ownership. Defendant's interpretation of Section 12 cannot stand as it reaches beyond the purpose of the section; an event that has no effect on the Dealer's ownership or control cannot violate Section 12. And although Defendant has presented evidence that the share transfer **may** affect Plaintiff's ownership or control, it is not clear that the share transfer has had such an effect. Reasonable minds could differ on whether a 23.4 percent change in shareholder interests, with no change in shareholder identity or majority, had any effect on Plaintiff's ownership or control. That question must be decided by a jury.

If the jury determines that the share transfers were a breach, the question remains whether Defendant waived that breach. Section 12 of the dealership agreements provides a consequence for breach of the Section: immediate termination of the agreement. Specifically, if Defendant withholds its consent to a change in control or ownership, but Plaintiff "nonetheless[] proceeds with the change, th[e] Agreement shall terminate immediately." (Dealership Agreements ¶ 12.) Relying on this language Plaintiff argues that Defendant's sole remedy for a breach of Section 12 is termination and that Defendant waived that remedy. Defendant

11

responds that termination is not the sole remedy, relying on Section 13 of the agreement, which governs termination broadly. Section 13 states that Defendant "may" terminate the agreement on the occurrence of a change in control or ownership of the dealership without Defendant's consent. This language conflicts with the language of Section 12, which provides for immediate termination in such instances; in the event of an unauthorized change in control, Section 12 says termination is "immediate" while Section 13 says Defendant "may" terminate.

When the provisions of a contract conflict in such a way, a specific provision will control over a general one. See Lay Bros., Inc. v. Golden Pantry Food Stores, Inc., 616 S.E.2d 160, 164 (Ga. Ct. App. 2005) ("Under general rules of contract construction, a limited or specific provision will prevail over one that is more broadly inclusive." (quotation omitted)). This maxim pairs well with another, the maxim that contracts are construed against the drafting party. See Maiz v. Virani, 253 F.3d 641, 660 (11th Cir. 2001) ("[D]oubts in a contract are construed strongly against the drafting party." (citing O.C.G.A. § 13-2-2(5))). Here it is undisputed that Defendant drafted the contracts at issue; they are form contracts, as indicated by the notation, "Form 4360 Rev. 5 (Jan. 05)" on the bottom-right corner of every page.

Applying these two rules of interpretation to the conflicting termination language compels the conclusion that the automatic

12

termination provision in Section 12 is the applicable remedy for a breach of that Section. In terms of the maxim that specific controls over general, both provisions are relatively specific in that they both apply in the event of an unauthorized change in ownership. However, Section 12 pairs a promise with a consequence for not keeping it, whereas Section 13 is a broader provision governing the termination of the agreement under various circumstances. As for the second maxim, Defendant could have written the contract to avoid automatic termination as provided for in Section 12 but did not. Construing the contract against Defendant, the remaining question is whether Defendant waived the breach by not following through on the automatic termination.

Defendant did not terminate the agreement, but instead again opted to use Plaintiff's breach to try to induce Plaintiff to sign a new dealership agreement.[4] (See Bansen Aff. ¶ 29 (stating that Defendant would ratify the ownership changes if Plaintiff signed a new dealership agreement).) While there is a no-waiver provision in Section 23 of the dealership agreements, even no-waiver

---

[4] Defendant's insistence and Plaintiff's unwillingness to sign a new dealership agreement is a recurring conflict in this case even though it is not being directly litigated. For example, Defendant also conditioned approval of Plaintiff's Savannah location on signing a new dealership agreement, which Plaintiff refused. (See Bansen Aff. ¶ 17.) The proposed new dealership agreement contains terms almost universally favorable to Defendant. (See, e.g., New Dealership Agreement at 23 (designating the Eastern District of Wisconsin for jurisdiction and venue rather than the district where the dealer is located).)

provisions can be waived under Georgia law.  See Yash Sols., LLC
v. N.Y. Glob. Consultants Corp., 834 S.E.2d 126, 134 (Ga. Ct. App.
2019) ("[U]nder Georgia law, a no-waiver or anti-waiver provision
in a contract may itself be waived." (citing Smith v. Gen. Fin.
Corp. of Ga., 255, S.E.2d 14, 15 (Ga. 1979)).)  "[W]hether the
conduct of the parties causes a waiver of contract provisions, and
a quasi new agreement effected, ordinarily, is a question of fact
for a jury."  Crawford v. First Nat'l Bank of Rome, 223 S.E.2d
488, 490 (Ga. Ct. App. 1976) (discussing waiver by conduct in the
context of contracts with no-waiver provisions) (citation
omitted).  Accordingly, the question of waiver must be decided by
a jury, and summary judgment is inappropriate.

Finally, Plaintiff argues that Defendant breached the
covenant of good faith and fair dealing by withholding approval
for the share transfer.  Beyond the duty implied in every contract,
Section 12 also explicitly imposes a duty on Defendant to consider
proposed changes in control or ownership in good faith.  See Brack
v. Brownlee, 273 S.E.2d 390, 392 (Ga. 1980) ("Every contract
imposes upon each party a duty of good faith and fair dealing in
its performance and enforcement.")  To the extent Plaintiff bases
a claim on Defendant's failure to consider the share transfer in
good faith, that claim fails; Plaintiff never presented a proposal
to Defendant to act on, instead making the share transfers without
any notice to Defendant.  Therefore, Defendant had no opportunity

14

to consider the transfer in good faith and could not have breached that duty.[5]

In summary, a dispute of material fact exists as to whether Plaintiff breached Section 12 of the contract when its owners transferred a total of 23.4 percent of the stock between each other. If so, under Section 12, an unauthorized change in ownership immediately terminates the dealership agreement. Defendant did not terminate the agreement. This leaves a second question for the jury as to whether Defendant waived the breach. Therefore, as to the share transfer issue, both Parties' motions are denied; a jury must decide whether the transfers breached the dealership agreements and if so, whether Defendant waived that breach.

## B. Savannah Dealership

As for Plaintiff's Savannah location, Plaintiff argues that Defendant breached the dealership agreements by refusing to approve the new location unless Plaintiff signed a new dealership agreement. Defendant responds that Plaintiff was the one who

---

[5] Defendant's offer to ratify the share transfers upon the signing of a new dealership agreement is again, not unnoticed. Although it suggests an ulterior motive may be affecting Defendant's treatment of the share transfers, in the case of Section 12, that concern is lessened by the fact that Section 12(a)(v) already conditions Defendant's approval of a change in control or ownership on the execution of a new dealership agreement.

breached by operating a dealership at Ogeechee Road without Defendant's approval as required by the contracts.

Section 4 of the dealership agreements states that Plaintiff "agrees not to change any location of [Plaintiff's] facilities nor establish any other additional locations without [Defendant's] prior written consent." The attachment to the agreements specifies that Plaintiff "agrees to maintain facilities only at the following authorized locations," listing Augusta and Savannah (to be established by June 2010) in the 2008 agreement and Decatur in the 2010 agreement. As mentioned in the Background section, in 2009 Defendant authorized Plaintiff to operate its Savannah dealership at a facility in Pooler. It is undisputed that in 2017 Plaintiff began operating at a different Savannah facility on Ogeechee Road.[6] (See Arrowood Dep. at 76-77; Bansen Aff. ¶¶ 15-23; Burt Dep., Doc. No. 87-6, at 20-21.)

Plaintiff argues that it is entitled to summary judgment on Defendant's counterclaims because Defendant waived any breach under Section 4 in an offer to "resolve" that breach which Plaintiff accepted through performance. Defendant argues it is entitled to summary judgment because Plaintiff did not obtain

---

[6] The Ogeechee Road facility was apparently an improvement over the Pooler facility. (See Arrowood Aff., Doc. No. 17-2, ¶ 14; George Preocanin Dep., Doc. No. 92-1, at 152). That Defendant seeks damages notwithstanding that fact lends some support to Plaintiff's contention that Defendant may be acting in bad faith.

Defendant's permission before opening the Ogeechee Road facility. While it is undisputed that Plaintiff opened the Ogeechee Road facility without permission, the email from Jim Bansen stating that a return to the Pooler facility would "resolve the breach of Section 4" creates a question of material fact as to waiver.[7]

"When a contract is continued in spite of a known excuse, the defense thereupon is lost . . . ." Nguyen v. Talisman Roswell, LLC, 585 S.E.2d 911, 913 (Ga. Ct. App. 2003) (quotation omitted). Despite the attempted reservation of rights in the email, a reasonable jury could conclude that Defendant waived the breach of Section 4 when Plaintiff returned to Pooler, particularly when Bansen's email does not condition the resolution of the Section 4 breach on the execution of a new agreement like it does for the Section 13 breach. See Nguyen, 585 S.E.2d at 913 ("A waiver of rights under a contract may be express or implied from acts or conduct." (quotation omitted)); Crawford, 223 S.E.2d at 490 (Ga. Ct. App. 1976) (stating that the question of waiver is one for the jury in the context of a contract with a no waiver provision). Plaintiff returned to the Pooler facility as per Defendant's offer. Reasonable jurors – and jurists – could thus differ on whether

_____

[7] "Should you elect to continue to operate the Case CE location out of the prior facility in Pooler, GA that is acceptable to resolve the breach of Section 4, however the requirement for the new dealer agreement remains a requirement to resolve the breach of section 13(b)(vi). . . . Case CE reserves all of its rights under the [Dealership Agreement]." (Jim Bansen Email.)

17

Defendant's conduct waived the breach of Section 4 in spite of its purported reservation of rights. Summary judgment is therefore inappropriate on the issue.

## C. Warranty Chargebacks

The Parties disagree over how to interpret Section 11 of the dealership agreements. This section states in relevant part that "[Defendant] shall reimburse [Plaintiff] for all warranty service performed on Products in accordance with [Defendant's] warranty policies and Certified Service Program requirements in effect at the time warranty work is performed." After conducting audits on Plaintiff's warranty service, Defendant determined that some of Plaintiff's service or documentation was not in compliance with the requirements set out in the DOG. It then requested repayment for the non-complying services. These requests are what the Parties refer to as the chargebacks.

Plaintiff makes four arguments as to why it should be granted summary judgment on its chargeback claims. First, Plaintiff contends it never agreed to chargebacks in the dealership agreements and points to the dealership agreements' merger clause in Section 23.[8] Plaintiff argues that the dealership agreements

---

[8] The relevant portions of Section 23 state:

This Agreement is and shall be deemed to be the complete and final expression of the agreement between the parties hereto as to the matters herein contained and provided for and supersedes all previous agreements

18

neither provide for chargebacks nor incorporate the DOG and that allowing Defendant to unilaterally change the contract through the DOG is prohibited. To the extent Plaintiff argues that it is therefore totally immune to having its warranty service challenged, that argument fails. Defendant responds that the DOG constitutes Defendant's warranty policies in effect when the service was performed under the language of Section 11, thereby incorporating the DOG into the dealership agreements.

Georgia law permits incorporation by reference, so long as the "provision to which reference is made has a reasonably clear and ascertainable meaning." Dan J. Sheehan Co. v. Ceramic Technics, Ltd., 605 S.E.2d 375, 379 (Ga. Ct. App. 2004) (quotation omitted). "Incorporation by reference requires 'sufficient reference to enable the court to construe [multiple signed memoranda] as one complete whole.'" In re Bennett, 2012 WL 12899076, at *2 (N.D. Ga. May 18, 2012) (modification in original) (quoting Houston v. Jefferson Standard Life Ins. Co., 168 S.E.2d 843, 846 (Ga. Ct. App. 1969)).

Whether the portion of Section 11 that Defendant posits incorporates the DOG is sufficient to accomplish that goal is an

---

between the parties. . . . Except as expressly provided for herein, this Agreement may not be amended or altered, or any of its provisions waived on behalf of [Defendant], except in writing signed by one of [Defendant's] duly authorized agents.

unsettled question of material fact. Although the text of Section 11 references the "Company's warranty policies and Certified Service Program requirements," it does not explicitly reference the DOG. Section 11 does not reference the DOG by name[9] despite the existence of the DOG prior to the execution of the dealership agreements, which Defendant's Counsel confirmed at oral argument. Nor is the DOG mentioned elsewhere in the dealership agreement.[10] Both Parties expressed at oral argument that the Certified Service Program is not applicable in Plaintiff's case.

The question then is whether the language "warranty policies" is specific enough to sufficiently identify the DOG for it to have been incorporated into the dealership agreement. See Bowman v. Walnut Mountain Prop. Owners Ass'n, 553 S.E.2d 389, 393 (Ga. Ct. App. 2001) ("A written . . . agreement may also incorporate by reference . . . other documents by **specific reference** and **identification** . . . ." (emphasis added)); Dan J. Sheehan Co., 605 S.E.2d at 379 ("As a matter of contract law, incorporation by reference is generally effective to accomplish its intended

---

[9] The proposed new dealership agreement does so and in no uncertain terms. (See New Dealership Agreement at 4 ("The DOG includes the standards of quality and performance that Case seeks to have associated with its Trademarks and is hereby incorporated by reference into this Agreement.")

[10] The DOG is mentioned only once in an attachment to the dealership agreement entitled "Case National Account Customers," which advises dealers that they may be required to perform repairs on the equipment of certain national equipment rental companies. (See Doc. No. 5-4, at 20.)

20

purpose where the provision to which reference is made has a reasonably clear and ascertainable meaning." (quotation omitted)). Clearly Section 11 contemplates some outside source that would govern reimbursement for warranty service, but reasonable minds could differ on whether Section 11's language is specific enough to demonstrate a meeting of the minds with regard to linking the DOG and the dealership agreements.

Plaintiff's second argument is based on Georgia's voluntary payment doctrine as codified in O.C.G.A. § 13-1-13. That section states, "Payments of claims made . . . where all the facts are known and there is no misplaced confidence and no artifice, deception, or fraudulent practice used by the other party are deemed voluntary and cannot be recovered unless made under an urgent and immediate necessity . . . ." Plaintiff argues that Defendant's reimbursements were made in a manner satisfying Section 13-1-13. Defendant responds that the reimbursements were not final because they were subject to Defendant's audit right under the DOG, and therefore the voluntary payment doctrine does not apply.

Section 4.3.1 of the DOG[11] provides:

In accordance with the provisions of the CNH Industrial Dealer Agreement, the dealer shall permit CNH Industrial persons designated by CNH Industrial to examine copy and

[11] The rest of the discussion of the chargeback issue assumes the DOG applies only for the purposes of explaining why certain arguments fail.

21

> audit all of the dealer's records and documents relating to warranty . . . claims. Verification is required to show that claims have been requested and paid according to the requirements set forth by CNH Industrial Warranty policy and procedures.

(Dealer Operating Guide, Doc. No. 87-10, at 3.) This section later states that reimbursements not made in accordance with the provisions of the DOG "are subject to charge back." (Id. at 8.) Although there is little case law on the applicability of the voluntary payment doctrine to contracts with a payment and chargeback scheme like the instant one, Defendant cites to a Georgia Superior Court case for the proposition that the voluntary payment doctrine does not apply to non-final payments. See Atl. Se. Airlines, Inc. v. Delta Air Lines, Inc., 2010 WL 5883622, at *1 (Ga. Super. Ct. Jan. 22, 2010). Although that case supports Defendant's position, the Court need not rely on it.

The plain language of O.C.G.A. § 13-1-13 is that a payment is voluntary "where all the facts are known." In this case, when Defendant makes the initial reimbursement to Plaintiff, it does not know all the facts. (See June 2019 Sriyani Fernando Aff., Doc. No. 93-5, ¶ 11 (stating that Defendant pays warranty reimbursement before reviewing any records).) This is presumably why the DOG, if it applies, allows Defendant to audit the warranty work with the potential for chargebacks. Therefore, Plaintiff's argument based on the doctrine fails because when Defendant makes the initial reimbursement it does so without knowledge of all the

22

facts as required to make a payment voluntary under O.C.G.A. § 13-1-13.

Plaintiff's third argument is that the chargebacks are unenforceable contractual penalties.[12] Defendant counters that the chargebacks are not meant to be penalties for a breach of the DOG and dealership agreements, but that the chargebacks are owed under the agreements. The essence of Defendant's argument is that the chargebacks are compensatory rather than punitive or liquidated damages because they represent the amount Plaintiff allegedly owes resulting from its failure to pay the chargebacks as allegedly required by the DOG and dealership agreements. The Court agrees. What is at issue in the chargeback claims is the unpaid chargebacks, or what Defendant determined Plaintiff owed for non-complying warranty work, rather than purely clerical errors. That amount is not a penalty or specified sum for an independent breach of contract, but an amount Defendant claims it is owed under the warranty provisions of the dealership agreements and DOG, and that by not paying the amount Plaintiff would be in breach. This comports with O.C.G.A. § 13-6-1's definition of contractual damages: "Damages are given as compensation for the injury sustained as a result of the breach of contract." Put simply, the

---

[12] Defendant had not audited Plaintiff until May of 2017, after the location change and discovery of the share transfers. (See Doc. No. 84-8 (notifying Plaintiff of an audit to take place in May of 2017).).

alleged breach is Plaintiff's failure to pay the chargebacks, and appropriate compensation for that breach would be the amount of the chargebacks. Accordingly, Plaintiff's third argument fails.

Finally, Plaintiff argues that it is entitled to reimbursement because it complied with the requirements of the DOG in performing the warranty work. Defendant responds with some examples of noncomplying warranty claims. Section 4.3.1 of the DOG requires Plaintiff to keep records of warranty work. (See Dealer Operating Guide at 3-8.) Examples of the types of records that must be retained include Work Order Records, Parts Records, Labor Records, and Warranty Eligibility Records. (See id.) The DOG further specifies the information each record must contain. By disputing Plaintiff's compliance with the DOG, the Parties put each of the disputed work orders at issue.

Because each Party asserts a breach of contract claim against the other and moves for summary judgment on it, they each carry the burden of proof at trial. This means, under the Fitzpatrick framework discussed in the Legal Standard section, each party must "show affirmatively the absence of a genuine issue of material fact" sufficient to entitle the moving party to a directed verdict if uncontested at trial. Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1116 (11th Cir. 1993) (emphasis original) (quotation omitted). Neither party can do so. Plaintiff provides argument disputing Defendant's audit process and Defendant's interpretation

of the DOG and explanation for why its employees could not comply with portions of the DOG. Although Defendant does provide some examples of allegedly deficient warranty claims, examples cannot speak for the entire body of potentially noncomplying claims.[13] (See, e.g., June 2019 Sriyani Fernando Aff. ¶ 28.) Without seeing the warranty claims themselves, this leaves a dispute of material fact, meaning neither party can satisfy their initial summary judgment burden.

The dispute over compliance with the DOG will involve the minutiae of the DOG's various recordkeeping procedures as applied to the over fifty allegedly deficient warranty claims. Such a detailed and fact-intensive inquiry has the potential to stagnate proceedings before the jury. Federal Rule of Civil Procedure 53 permits courts to appoint a master to recommend findings of fact in such situations. Cf. Zaki Kulaibee Establishment v. McFliker, 771 F.3d 1301, 1315-16 (11th Cir. 2014) (discussing the use of a master to conduct court-directed accountings). The services of a master in this case may be beneficial in keeping the trial focused on the broader issues.

To review, a question of fact remains on whether the DOG is incorporated into the dealership agreements but Plaintiff's other legal arguments for the invalidity of the DOG are unavailing. The

---

[13] The audit findings (doc. no. 1-1, at 12-15) indicate that there are over fifty warranty claims that violated the DOG.

25

remaining question is whether Plaintiff complied with the requirements of the DOG, if applicable. This will be an involved factual question for the jury, which may be aided by the appointment of a master.

## D. Punitive Damages

Defendant moves for summary judgment as to Plaintiff's punitive damage claim. Count VI of Plaintiff's Amended Complaint asserts a punitive damage claim stemming from its claim under Georgia's Agricultural Dealer Act, which regulates agricultural equipment dealers. See generally O.C.G.A. § 13-8-11 et seq. Plaintiff has abandoned its claims under these laws, and therefore summary judgment in favor of Defendant is appropriate on the related punitive damages claim. (See Pl.'s Mot. Summ. J. at 3 ("While [Plaintiff] previously asserted other claims in an Amended Complaint arising under [the Agricultural Dealer Act], those claims were resolved by virtue of the Court's summary judgment order and have otherwise been abandoned by [Plaintiff]") (citing the Court's July 9, 2019 Order, Doc. No. 50).)

### IV. Conclusion

Despite Defendant's arguments that Plaintiff breached the dealership agreements in form, the sort of manifest failures often found in franchise-type breach of contract cases are absent here. There has been no failure on the part of Plaintiff to sell, repair,

or otherwise promote Defendant's brand and equipment. Instead, Defendant's counterclaims hold seemingly perimetric transgressions against Plaintiff in an attempt to force it out of dealer-friendly, potentially-indefinite, dealership agreements into a new agreement with terms all but universally favoring Defendant. Nonetheless, disputes of material fact remain in each of the three main issues making summary judgment inappropriate.

Upon the foregoing and summarized as follows, Plaintiff's motion for summary judgment (doc. no. 83) is **DENIED,** and Defendant's motion for summary judgment (doc. no. 87) is **GRANTED IN PART**. As to the issue of the share transfers, jury issues remain as to whether the transfers breached, and if so, whether Defendant waived the breach. Accordingly, both Parties' motions are **DENIED** as to the share transfer issue. On the issue of the Savannah location, questions of waiver and damages must be tried to a jury. Accordingly, both Parties' motions are **DENIED** on the question of the location change. On the issue of the warranty chargebacks, there exists a question of material fact as to whether the DOG was incorporated into the dealership agreements and whether Plaintiff's warranty work and claims complied with the DOG. Therefore, summary judgment is **DENIED** to both Parties on those issues. Finally, summary judgment is **GRANTED** to Defendant on Plaintiff's punitive damages claim.

This case shall proceed to trial on the following questions: 1) Whether Plaintiff's owners' share transfers breached the dealership agreements and if so, whether Defendant waived that breach; 2) whether Defendant waived the breach of Section 4 with regard to the Ogeechee Road facility; and 3) whether the DOG was incorporated into the dealership agreements and if so, whether Plaintiff's warranty work and claims complied with the DOG.

**ORDER ENTERED** at Augusta, Georgia, this 13th day of March, 2020.

_____
UNITED STATES DISTRICT JUDGE